**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Charles Towery, | No. CV-03-826-PHX-MHM |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| vs. | |
| Dora B. Schriro, et al., | **MEMORANDUM OF DECISION AND ORDER** |
| Respondents. | |

Petitioner Robert Charles Towery has filed an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that he was convicted and sentenced to death in violation of the United States Constitution. (Dkt. 26.)[1] Respondents filed an answer to the amended petition and Petitioner filed a reply. (Dkts. 32, 40.) For the reasons set forth below, the Court concludes that Petitioner is not entitled to habeas relief.

## BACKGROUND

Mark Jones was strangled to death in his home in Scottsdale, Arizona, on September 4, 1991. Petitioner and Randy Allen Barker were charged with six counts relating to the killing: first-degree murder, armed robbery, first-degree burglary, kidnapping, theft, and attempted theft. The trial court granted Petitioner's motion to sever the trials. Barker

---

[1]       "Dkt." refers to the documents in this Court's file. "PR doc." refers to enumerated documents contained in the record on appeal from Petitioner's post-conviction proceedings (Case No. CR 02-0031-PC). "ROA" refers to documents the in Petitioner's direct appeal (Case No. CR-92-0493-AP), "RT" to the reporter's transcripts, and "ME" to the minute entries of the trial court. The original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court. (Dkts. 85, 86.)

1    testified against Petitioner in exchange for a reduced charge of second-degree murder.

2        As the Arizona Supreme Court explained, while "[o]ther witnesses corroborated

3    some critical features of Barker's story and connected Petitioner with the charged offenses

4    . . . , the State's case rested on Barker's testimony." *State v. Towery*, 186 Ariz. 168, 174 920

5    P.2d 290, 296 (1996). The court summarized Barker's version of events as follows:

> Defendant, Barker, and John Meacham rented a three-bedroom house
> in Scottsdale, Arizona. Defendant occupied one bedroom with his girlfriend,
> Diane Weber, and her infant daughter. Barker occupied another bedroom
> with his then-girlfriend, Monique Rousseau. For several weeks, Defendant
> and Barker had discussed "pulling off a robbery" of one of two possible
> victims known to Defendant. On September 4, 1991, they decided to rob
> Mark Jones at his home.
>
> That evening they drove in Barker's car to a Denny's Restaurant where
> they called a taxi. The taxi dropped them off near Jones' home. They walked
> to the house and knocked on the door. When Jones answered, Defendant said
> his car had broken down and asked if he and Barker could come in to use the
> telephone. Defendant asked Jones, "Do you remember me? I'm from R and
> D Automotive." Jones had been introduced to Defendant on a prior occasion
> when Defendant sought counseling about his new business enterprise. Jones
> invited them in and showed them the telephone. While Barker faked a
> telephone call, Defendant opened his briefcase and pulled out a gun. The
> briefcase also contained gloves, plastic tie wraps, handcuffs, and a large
> veterinary syringe apparently filled with battery acid. After Defendant and
> Barker put on gloves, Barker handcuffed Jones. Defendant rummaged
> through the house, took Jones' car keys, and loaded Jones' Lincoln with a
> television, photocopy machine, cameras, jewelry, and other items. Defendant
> removed Jones' wallet from his back pocket and took about $200 and credit
> cards. They also took $1,000 from a desk drawer.
>
> Before leaving, Defendant and Barker took Jones to the master
> bedroom at gunpoint, uncuffing him while he used the bathroom along the
> way. They asked him whether he was expecting anyone soon, and Jones said
> no. According to Barker, Defendant offered Jones "about two choices in the
> matter of how we could leave him. One was . . . [to] tie him up, . . . the other
> was to introduce a drug into him to make him sleep instead of being tied up."
> Jones chose to be put to sleep and was laid face down on the bed with his
> hands bound behind his back. Contrary to his statement to Jones, Defendant
> apparently believed the injected substance would kill Jones.
>
> At his request, Jones' shoes were removed to make him more
> comfortable. Defendant made several attempts to inject the contents of the
> syringe into Jones' arm, pushing the needle all the way through a vein. The
> drug having no effect, Jones pretended to sleep by snoring. Determined to
> kill Jones, Defendant made a noose out of plastic tie wraps from his briefcase,
> slipped it over Jones' head, and pulled tightly on its end to strangle Jones.
> Jones did not struggle but made choking and gagging sounds. Defendant then
> cut and removed the tie-wrap noose from Jones' neck. Believing Jones was
> not yet dead, Defendant made another noose "like the first one . . . popped [it]
> over the head, and pulled tight with a 'zip' sound," explained Barker.

The two men then loaded a large television into Jones' other car, a Dodge convertible. While trying to start the Dodge, Barker set off its alarm. Barker jumped into the Lincoln and the two men drove away with Defendant at the wheel. Barker allegedly threw the empty syringe out the window into an oleander hedge [FN1] as they drove back to Denny's to get Barker's car. They returned to their home, unloaded the goods, putting some into Meacham's bedroom, and removed a compact disk player from the Lincoln's dash. Defendant then drove the Lincoln to the parking lot of an apartment complex while Barker followed in his car. They parked the Lincoln there and returned home. A security guard at the complex saw the men and later identified Defendant in a photo lineup.

FN1. Police later searched the area for the syringe but never found it.

The next morning, Meacham returned from work to discover in his bedroom items he had not seen before. Defendant, Barker, and Diane were also in the house. Meanwhile, two employees of the golf club that Jones frequented had looked for Jones and found his body about mid-morning that day.

*Id.* at 174-75, 920 P.2d at 296-97.

Petitioner testified and offered an alibi defense, which the Arizona Supreme Court summarized as follows:

According to Defendant, on the night of the robbery he had driven Barker to Denny's in Barker's car. He had a soda until Barker's taxi arrived, then drove to Zorba's, an adult book store, where he had arranged to meet Tina Collins. While waiting, Defendant went inside to buy a book and returned to his car. Tina arrived at Zorba's about fifteen minutes after Defendant. They then drove and parked near Defendant's home, talking for about two hours in the car. Defendant returned to Zorba's, dropped Tina off, and went to meet Barker at a Circle K near their house. Because Barker was not there as planned, Defendant went home. Barker soon arrived home with a stolen car and stolen property. Defendant claimed he helped Barker unload the goods and dispose of the stolen car. To account for the stolen property police found in his possession, Defendant claimed he had bought the items from Barker.

*Id.* at 175, 920 P.2d at 297.

Despite Petitioner's testimony, and corroborating testimony from Collins, the jury found Petitioner guilty of felony murder and all other counts. At sentencing, the trial judge found three statutory aggravating factors: that Petitioner had been convicted of a crime for which a life sentence was imposable, committed the murder for financial gain, and committed the murder in an especially cruel, heinous, or depraved manner. (ME 11/20/02.) The court found two mitigating factors, that Petitioner's drug use impaired his capacity to conform his conduct to the law and that co-defendant Barker received a lenient plea-

bargained sentence.  (*Id.*)   The court determined that the mitigating factors were not sufficiently substantial to call for leniency and sentenced Petitioner to death.  (*Id.*)

The Arizona Supreme Court affirmed the murder conviction and death sentence. *State v. Towery*, 186 Ariz. 168, 920 P.2d 290 (1996).  Petitioner filed a motion for post-conviction relief ("PCR") and a motion to disqualify Judge Cheryl Hendrix, who had also presided over his trial. (PR docs. 26-29.)  The latter motion, assigned to another judge, was denied. (ME 10/22/99.)  Judge Hendrix denied the PCR petition. (ME 1/24/01.)  Petitioner filed a motion for rehearing (PR doc. 51), which was also denied (ME 10/25/01).  Petitioner filed a petition for review of the denial of his motion to disqualify Judge Hendrix and the denial of his motion for rehearing.  The Arizona Supreme Court denied review of all issues with the exception of the retroactive application of the holding in *Ring v. Arizona*, 536 U.S. 584 (2002).  Petitioner's case was consolidated with those of three other capital defendants, and in *State v. Towery*, 204 Ariz. 386, 64 P.3d 828 (2003), the court held that *Ring* does not apply retroactively.

Petitioner filed his initial petition for writ of habeas corpus with this Court on April 30, 2003, and his amended petition on November 14, 2003.  (Dkts. 1, 26.)  The case was stayed from August 31, 2004, to December 21, 2007, while Petitioner pursued DNA testing in state court.  (Dkts. 44, 80.)

## DISCUSSION

### I.   EXHAUSTION AND PROCEDURAL DEFAULT

Respondents contends that Petitioner failed to exhaust several of his claims in state court and therefore they are barred from consideration on federal habeas review.  These include a claim that Judge Hendrix was biased at trial, several of Petitioner's allegations of ineffective assistance of counsel, and the claim that the death penalty violates the Equal Protection Clause.

#### Principles

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v.*

*Thompson*, 501 U.S. 722, 731 (1991).  To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971).

In Arizona, there are two procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction relief proceedings.  Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition.  Ariz. R. Crim. P. 32.2(a)(3).  The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner.  *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds.  *Coleman*, 501 U.S. at 729-30.  The procedural bar relied on by the state court must be independent of federal law and adequate to warrant preclusion of federal review.  *See Harris v. Reed*, 489 U.S. 255, 262 (1989).  Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam), and the Ninth Circuit has repeatedly determined that Arizona regularly and consistently applies its preclusion rules such that they are an adequate bar to federal review of a claim.  *See Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997).

Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz*, 149 F.3d at 931 (district court must consider whether the claim could be pursued by any presently available state remedy).  If no remedies

are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750. Petitioner does not assert that either cause and prejudice or a fundamental miscarriage of justice excuses the procedural default of any claim at issue in this Order.

**Discussion of Claims**

**Claim B:  Judicial Bias – Trial Court**

Petitioner alleges that Judge Hendrix was biased against him at his murder trial. (Dkt. 26 at 9-14.) In support of this contention he relies on the fact that Judge Hendrix presided over a prior armed robbery trial in which Petitioner was convicted. (*Id.*) He also points to the judge's adverse rulings during the murder trial. (*Id.*) Respondents counter that the claim is procedurally barred and meritless. (Dkt. 32 at 19.)

Petitioner did not raise this claim on direct appeal. Instead, he raised it in his PCR petition. (PR doc. 29 at 7-9.) Judge Hendrix denied the claim on the merits, rejecting the assertion that the court became biased against Petitioner after presiding over his first trial and specifically dismissing the allegation that its bias was manifest when it permitted Meacham to testify against Petitioner at both trials.[2] (ME 1/24/01 at 4-5.) Petitioner raised the judicial bias claim again in his motion for rehearing. (PR doc. 51 at 4.) The matter was

---

[2]    Petitioner had raised the same allegations in his motion to disqualify Judge Hendrix from the PCR proceedings. (PR doc. 28.) The matter was assigned to Judge Michael McVey, who denied the motion after an evidentiary hearing. (ME 10/22/99.)

assigned to Judge James Keppel, who rejected as "unfounded" the allegation that a court's ruling on a particular issue is sufficient to establish bias. (ME 10/25/01 at 2.) Judge Keppel also ruled that the claim was precluded under Rule 32.2(a)(3) of the Arizona Rules of Criminal Procedure because it was not raised on direct appeal. (*Id.*)

Judge Keppel's decision is the last reasoned state court judgment on Petitioner's judicial bias claim. *See Ylst v. Nunnemaker*, 501 US 797, 803 (1991). The decision "explicitly imposed a procedural default."[3]   *Id.*   This preclusion ruling rests on an independent and adequate state procedural bar. *See Smith*, 536 U.S. at 860 (Arizona's Rule 32.2(a) is independent of federal law); *Ortiz*, 149 F.3d at 931-32 (Rule 32.2(a)(3) is an adequate procedural bar). Petitioner does not attempt to demonstrate cause and prejudice or a fundamental miscarriage of justice to excuse the default. Consequently, federal habeas review of Petitioner's judicial bias claim is barred. Claim B is therefore denied.

**Claim D:  Ineffective Assistance of Counsel**

Petitioner raises several allegations that trial counsel performed ineffectively. (Dkt. 26 at 15-20.) Respondents concede that five of these allegations are properly exhausted but contend that Petitioner failed to present the remaining allegations in state court. (Dkt. 32 at 20-21.) The Court agrees. In his PCR petition, Petitioner did not raise the allegations that trial counsel performed ineffectively by failing to prevent inconsistent use of Meacham's testimony, failing to obtain transcripts from Petitioner's prior armed robbery trial, and failing to interview witnesses. (*See* PR doc. 29 at 11-12.)

In reply to Respondents' assertion that the allegations are not exhausted, Petitioner states that "[t]hese three issues are merely further illustrations of the claims raised by [Petitioner] in state court relating to ineffective assistance of counsel." (Dkt. 40 at 13-14.) Petitioner is incorrect.

---

[3]       The fact that Judge Keppel alternatively discussed the merits of the claim does not affect the application of Rule 32.2(a)(3). The court "explicitly invoke[d] a state procedural bar as a separate basis for decision." *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

Allegations of ineffective assistance of counsel ("IAC") constitute separate claims, each of which must be exhausted in state court. *See Strickland*, 466 U.S. at 690 (stating that a petitioner making an IAC claim must identify the particular acts or omissions of counsel that are alleged to have been the result of unreasonable professional judgment). The Ninth Circuit has confirmed that a generic IAC claim is insufficient to exhaust particular allegations of ineffectiveness. *See Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005); *Carriger v. Lewis,* 971 F.2d 329, 333-34 (9th Cir. 1992) (en banc). Therefore, specific claims of IAC that were not presented in state court are not properly exhausted; rather, they are technically exhausted but procedurally defaulted and therefore unavailable for federal habeas review.

The Court will address the merits of Petitioner's properly-exhausted IAC claims below.

### Claim H:  Equal Protection

Petitioner alleges that the imposition of the death penalty violates his equal protection rights because not all states have the death penalty and if he "had been convicted of a similar crime in a different state, across an arbitrary state line, he would not have received the death penalty." (Dkt. 26 at 23-34.) Respondents contend that the claim is procedurally barred and meritless.  (Dkt. 32 at 33.)  The Court agrees.

Petitioner first raised this claim in his PCR petition.  (PR doc. 29 at 13.)  The PCR court found the claim waived under Rule  32.2(a)(3) because it should have been raised on direct appeal.  (ME 1/24/01 at 11.)  This preclusion ruling rests on an independent and adequate state procedural bar.  *See Smith*, 536 U.S. at 860; *Ortiz*, 149 F.3d at 931-32. Petitioner does not attempt to demonstrate cause and prejudice or a fundamental miscarriage of justice to excuse the default.  Consequently, federal habeas review of Petitioner's judicial bias claim is barred.  Claim H is denied.[4]

---

[4]      In addition, the claim does not entitle Petitioner to habeas relief because it is not supported by clearly established federal law, as required under the standards of the

1    **II.    MERITS**

2        The Court turns to the merits of Petitioner's properly exhausted claims.  In doing so,

3    the Court applies the applicable provisions of the Antiterrorism and Effective Death Penalty

4    Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

5    <u>**AEDPA Standard for Relief**</u>

6        The AEDPA established a "substantially higher threshold for habeas relief" with the

7    "acknowledged purpose of 'reducing delays in the execution of state and federal criminal

8    sentences.'"  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v.*

9    *Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for

10   evaluating state-court rulings' . . . demands that state-court decisions be given the benefit

11   of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh*,

12   521 U.S. at 333 n.7).

13       Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

14   "adjudicated on the merits" by the state court unless that adjudication:

15       (1) resulted in a decision that was contrary to, or involved an unreasonable
         application of, clearly established Federal law, as determined by the Supreme
16       Court of the United States; or

17       (2) resulted in a decision that was based on an unreasonable determination of
         the facts in light of the evidence presented in the State court proceeding.

18   28 U.S.C. § 2254(d).

19       The phrase "adjudicated on the merits" refers to a decision resolving a party's claim

20   which is based on the substance of the claim rather than on a procedural or other non-

21   substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The relevant

22   state court decision is the last reasoned state decision regarding a claim.  *Barker v. Fleming*,

23   423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. at 803-04);

24   *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

25       "The threshold question under AEDPA is whether [the petitioner] seeks to apply a

26

27   _____

     AEDPA, discussed below.

28
                                              - 9 -

rule of law that was clearly established at the time his state-court conviction became final."
*Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."  *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240.  However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness.  *Miller-El I,* 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

**Discussion of Claims**

**Claim A:  Prosecutorial Misconduct**

Petitioner alleges that his due process rights were violated by the prosecutor's misconduct in introducing an inculpatory statement by Petitioner after using the statement to prove an unrelated crime in a previous trial.  (Dkt. 26 at 5-9.)

Background:

In March 1992, about six months after the murder and five months before the murder trial, Petitioner was tried on four counts of armed robbery in an unrelated case.  At that trial,

John Meacham, Petitioner's and Barker's roommate, testified that he overheard Petitioner say, "I tried to get this old man to do what I wanted him to do, but he wouldn't do it." *See Towery*, 186 Ariz. at 181, 920 P.2d at 303. At the subsequent murder trial, Meacham was again called to testify. He stated that he heard Petitioner tell Barker that he was "having a hard time with an old man so he had – he had a hard time tying him up, so he had to knock him down." (RT 8/11/92 at 30.)

The victims of both crimes were older men; Mr. Jones was 68, the robbery victim 55. Petitioner had different counsel at the two trials. Counsel at the murder trial moved for a transcript of the robbery trial, but the court denied the motion. (ROA 43; ME 6/3/92.) Before presenting Meacham's testimony in the murder trial, the prosecutor failed to notify the court or defense counsel that he would present evidence of the same admission Meacham described in the robbery trial. It is undisputed that Meacham heard only one admission about one crime.[5]

On direct appeal, Petitioner claimed that by presenting evidence of a single incident at two separate trials to prove two separate, unrelated crimes, the prosecutor violated Petitioner's due process rights and the doctrine of estoppel by engaging in misconduct.[6] The Arizona Supreme Court held that the prosecutor had engaged in misconduct but determined

---

[5]    At oral argument before the Arizona Supreme Court, the State conceded that the prosecutor elicited testimony of an admission about a single incident to help establish Petitioner's guilt of two unrelated crimes. *Towery*, 186 Ariz. at 184, 920 P.2d at 306. The prosecutor indicated that he had been mistaken in presenting Petitioner's admission at the robbery trial. *Id.* According to the State, as the murder investigation developed the prosecutor became more convinced that Petitioner's admission related to the murder, not the armed robbery, explaining that the admission was made after the murder, better fit the facts of the murder, and was therefore relevant evidence in the murder trial. *Id.*

[6]    The Arizona Supreme Court also rejected Petitioner's judicial estoppel claim, holding that the State's prior position – i.e., that the statement reported by Meacham referred to the armed robbery – was not "successfully maintained" as required for estoppel, because "Meacham's testimony about Defendant's inculpatory statement was at most an insignificant factor in light of the overwhelming evidence of Defendant's guilt on the armed robbery charge." *Towery*, 186 Ariz. at 184, 920 P.2d at 306.

that the misconduct constituted harmless error and that Petitioner did not suffer prejudice mandating a new trial. *Towery*, 186 Ariz. at 185-86, 920 P.2d at 307-08. First, the court explained: "In the murder trial, even had defense counsel been aware of the prior use of Meacham's testimony, the State would probably have been permitted, over defense objection, to elicit the same testimony from Meacham by disavowing the relevance of the testimony in the armed robbery trial and placing the reviewing court on notice so it could be considered in [Petitioner's] appeal of that conviction." *Id.* at 185, 920 P.2d at 307. Next, while acknowledging that defense counsel in the murder trial could have impeached Meacham with his prior testimony had he been aware of it, the court noted that Meacham's testimony was significantly impeached at the latter trial. *Id.* In cross-examining Meacham, defense counsel successfully challenged the State's theory of the import of Petitioner's admission:

> Q. Do you know for sure that [Petitioner was] talking about Mr. Jones [the murder victim]?
>
> A. I thought [he was] talking about when [he] got busted before.
>
> Q. So, in fact, you didn't think [he was] talking about Mr. Jones?
>
> A. No, sir, I didn't.

(RT 8/11/92 at 40.)

The prosecutor attempted to rehabilitate Meacham on redirect examination by showing that Petitioner might have been describing the circumstances of the murder rather than the robbery:

> Q. Okay. The conversation that you overheard, was it before or after all of this property came into the house?
>
> A. I believe it was after.
>
> Q. And you don't really know what the conversation that you heard pertains to, do you?
>
> A. No, sir.

(*Id.* at 41.)

- 13 -

Citing the equivocal nature of Meacham's testimony, the state supreme court found that "[a]ny impeachment defense counsel would have obtained from having known of the testimony in the prior trial was effectively achieved.  Accordingly, we conclude beyond a reasonable doubt that the prosecutor's misconduct did not affect the verdict." *Towery*, 186 Ariz. at 185, 920 P.2d at 307.  Finally, because "the prosecutor's misconduct did not violate any of [Petitioner's] constitutional rights resulting in reversible error," the court determined that "the proper remedy is to report the offender to the state bar for possible sanctions, which we have done." *Id.*

Analysis:

Petitioner alleges that the State knowingly presented false testimony, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and *Unites States v. Agurs*, 427 U.S. 97 (1976).  To prevail on a *Napue* claim, a petitioner must show that (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.  *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269-71); *see Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006).  Petitioner cannot make this showing because Meacham's testimony was not false.  As noted above, Meacham simply recounted the conversation he had with Petitioner.  He did not testify that Petitioner's comments referred to the murder victim – to the contrary, he acknowledged that he was not sure which incident Petitioner was describing but he thought it was the robbery.

Similarly, Petitioner has not shown that the presentation of Meacham's testimony, or the prosecutor's failure "to enlighten defense counsel and the court . . . that he was planning to use this testimony inconsistently" (Dkt. 26 at 8), was material or prejudicial to the defense.  Failure to disclose information that might have been helpful in conducting cross-examination amounts to a constitutional violation only if it deprives the defendant of a fair trial. *United States v. Bagley*, 473 U.S. 667, 676 (1985).  The failure to disclose such evidence is material, and therefore prejudicial, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different." *Strickler v. Greene*, 527 U.S. 263, 280, 282 (1999) (quoting *Bagley*, 473 U.S. at 682); *see Agurs*, 427 U.S. at 112 (petitioner entitled to relief "if the omitted evidence creates a reasonable doubt that did not otherwise exist"); *Morris v. Ylst*, 447 F.3d at 743.

As an initial matter, the prosecution did not fail to disclose any information. *See United States v. Albanese*, 195 F.3d 389, 393 (8th Cir. 1999) (no *Brady* violation based on government's failure to notify defense that witness was testifying inconsistently because witness "gave his prior testimony at a public proceeding"). The defense knew that Meacham would be a witness and Petitioner was aware of Meacham's testimony in his first trial; therefore, counsel had "ample opportunity to learn about [the] prior testimony." *Id.* In addition, as the Arizona Supreme Court noted, in cross-examining Meacham defense counsel effectively countered the prosecution's imputation that Petitioner was describing the murder rather than robbery. Under counsel's questioning, Meacham testified that he believed the conversation referred to the earlier crime. Counsel could not have achieved anything more if he had been aware of the State's prior inconsistent use of the testimony. Therefore, there is not a reasonable probability that the jury would have reached a different verdict if the prosecutor had directly informed the defense that he was going to present Meacham's testimony recounting his conversation with Petitioner.

Finally, this is not a case where the testimony supporting contradictory theories was essential to the conviction. *See Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000) (conviction of multiple defendants of the same crimes through the use of inherently factually contradictory theories violated due process where the witness's testimony was "the sole basis for two different convictions on two contradictory theories"). Instead, Meacham's testimony, the ambiguity of which was fully revealed on cross- and redirect examination, was of minimal significance to the State's case, which was based primarily upon Barker's eyewitness account of the crimes. *See Shaw v. Terhune*, 380 F.3d 473, 478-80 (9th Cir. 2004) (even if petitioner's rights were infringed by prosecutor's decision to seek personal use enhancement against accomplice after successfully arguing in earlier trial that petitioner had personally used firearm, habeas relief was not warranted because there was sufficient

1  evidence on which the jury could have convicted petitioner without implicating the factual

2  tension in the prosecutor's argument).

3       For the reasons set forth above, Claim A is denied.

4       **Claim C:  Judicial Bias – Post-conviction Proceedings**

5       Petitioner alleges that Judge Hendrix, having presided over both of his criminal trials,

6  was biased against him in violation of his due process rights. (Dkt. 26 at 14-15.)  According

7  to Petitioner, Judge Hendrix's bias was exacerbated by his motion to disqualify her.  (*Id.*)

8  In support of his allegation of partiality, Petitioner cites various rulings and comments made

9  by the judge.  (*Id.* at 13-14.)

10      Petitioner is not entitled to habeas relief on this claim.  Errors in a state post-

11  conviction proceeding do not attack the constitutionality of a petitioner's detention, but

12  rather represent an attack on a proceeding collateral to the detention. *Franzen v. Brinkman*,

13  877 F.2d 26, 26 (9th Cir. 1989).  Because such errors do not attack the constitutionality of

14  the detention, they are not cognizable in a habeas corpus proceeding under 28 U.S.C. §

15  2254.  *Id.*; *see Ortiz*, 149 F.3d at 939.  The Eleventh Circuit, for example, has held that a

16  judge's refusal to disqualify himself from hearing a petition for collateral relief despite

17  allegations of bias was not cognizable on habeas review because it was unrelated to the

18  cause of the petitioner's detention. *Quince v. Crosby*, 360 F.3d 1259, 1261-62 (11th Cir.

19  2004) ("Therefore, while habeas relief is available to address defects in a criminal

20  defendant's conviction and sentence, an alleged defect in a collateral proceeding does not

21  state a basis for habeas relief.").

22      Even if this claim were cognizable, it is without merit.  Adverse rulings and critical

23  comments are not sufficient to support a claim of judicial bias.  *Ortiz*, 149 F.3d at 939-40.

24  The specific allegations in Claim C are disposed of by application of the clearly established

25  federal law set forth in *Liteky v. United States*, 510 U.S. 540, 551 (1994), in which the

26  Supreme Court noted that "not subject to deprecatory characterization as 'bias' or

27  'prejudice' are opinions held by judges as a result of what they learned in earlier

28  proceedings.  It has long been regarded as normal and proper for a judge to sit in the same

case upon its remand, and to sit in successive trials involving the same defendant." The

Court further explained:

> First, judicial rulings alone almost never constitute a valid basis for a bias or
> partiality motion. *See United States v. Grinnell Corp.* 384 U.S. at 583, 86
> S.Ct., at 1710.  In and of themselves (*i.e.,* apart from surrounding comments
> or accompanying opinion), they cannot possibly show reliance upon an
> extrajudicial source; and can only in the rarest circumstances evidence the
> degree of favoritism or antagonism required . . . when no extrajudicial source
> is involved.  Almost invariably, they are proper grounds for appeal, not for
> recusal.   Second, opinions formed by the judge on the basis of facts
> introduced or events occurring in the course of the current proceedings, or of
> prior proceedings, do not constitute a basis for a bias or partiality motion
> unless they display a deep-seated favoritism or antagonism that would make
> fair judgment impossible.

*Id.* at 555.

For the reasons set forth above, Claim C is denied.

**Claim D:  Ineffective Assistance of Counsel**

Petitioner alleges that several aspects of trial counsel's performance were

constitutionally ineffective.  The PCR court, applying *Strickland v. Washington*, 466 U.S.

668 (1984), rejected the claims.  (ME 1/24/01 at 7-8.)  As set forth below, the Court finds

that Petitioner is not entitled to relief based on these allegations.

<u>Analysis:</u>

For IAC claims, the applicable law is set forth in *Strickland*.  To prevail under

*Strickland*, a petitioner must show that counsel's representation fell below an objective

standard of reasonableness and that the deficiency prejudiced the defense.  466 U.S. at 687-

88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made

to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

*Id.* at 689.  Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must

overcome "the presumption that, under the circumstances, the challenged action might be

considered sound trial strategy." *Id.*  For example, while trial counsel has "a duty to make

reasonable  investigations  or  to  make  a  reasonable  decision  that  makes  particular

investigations unnecessary, . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691.   To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted). The Supreme Court has directed that: "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made" and by applying deference to counsel's judgments. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689); *see Karis v. Calderon*, 283 F.3d 1117, 1130-31 (9th Cir. 2002).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

Additional principles apply to this Court's review of Petitioner's claims. First, "[c]onclusory allegations [of IAC] which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).   In addition, under the AEDPA, this Court's review of the state court's decision is subject to another level of deference.   *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).   In order to merit habeas relief, therefore, Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*.   28 U.S.C. § 2254(d)(1).

*(1)  Failure to impeach Barker regarding clothing*

Petitioner, explaining that he is shorter than Barker, alleges that counsel performed ineffectively by failing to impeach Barker's testimony "by having [Petitioner] try on Barker's clothing, or, at a minimum, by cross-examining Barker on their different clothing sizes."  (Dkt. 26 at 18.)

The PCR court denied this claim:

> [T]here is no indication that any clothes were seized for the defendant to try on in front of the jury.  The jury was able to observe the stature of both men.  They heard the testimony that Barker loaned clothes to the defendant to wear so that he would look respectable in going to the victim's neighborhood and suspicions would not be aroused.  The jury had sufficient information before it to evaluate the testimony.  The trying on of clothes is not something that would have effected [sic] the outcome.  There was no prejudice.

(ME 1/24/01 at 8.)  This ruling was not an unreasonable application of *Strickland*.

At trial, Barker testified that he loaned Petitioner the clothes Petitioner wore on the night of the murder; according to Barker, they both wore Levis, a white shirt, and a tie. (RT 8/4/92 at 123, 8/9/92 at 110.) Petitioner wanted them to look "businesslike" when they went to the victim's upscale neighborhood.  (RT 8/4/92 at 123-24; *see* RT 8/5/92 at 110-11.) Monique Rousseau, Barker's then girlfriend, also testified that on the night of the murder Petitioner wore Barker's clothing, including one of his shirts, which she described as plaid, blue, and short-sleeved.  (RT 8/11/92 at 49, 74.)  The security guard at the apartment complex where the victim's stolen vehicle was left testified that he saw two males of approximately the same height, around six feet; they were not wearing dress shirts or ties. (RT 8/12/92 at 38, 41.)  In a photo lineup he identified the less clean-cut of the two individuals as Petitioner.  (RT 8/11/92 at 97, 8/12/92 at 39.)

Given this record, and the lack of any evidence as to the "great height discrepancy" between Petitioner and Barker, Petitioner's conclusory allegations fall far short of establishing deficient performance or prejudice based on counsel's failure to have Petitioner try on Barker's clothing before the jury.  Petitioner simply offers no basis on which this Court can disregard the deference owed to trial counsel's strategic decisions, let alone the

additional layer of deference owed to the decision of the PCR court under the AEDPA. "A disagreement with counsel's tactical decisions does not provide the basis for declaring that the representation was constitutionally deficient." *Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006) (en banc); *see Strickland,* 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984) (relief on IAC claim denied where "petition does not set forth facts" that would allow the court to conclude that counsel's action did not reflect a "tactical decision").

Moreover, even a successful demonstration that Barker's clothing was too big for Petitioner would have had no bearing on the case. Petitioner asserts that if Petitioner had worn Barker's clothes "he would have looked ridiculous on the night of the murders and undoubtedly would have been recognized by numerous witnesses." (Dkt. 26 at 18.) This analysis is faulty because, according to the version of events offered by either Barker or Petitioner, there were no other witnesses who potentially could have identified Petitioner in his ill-fitting outfit. Either Petitioner went to Denny's with Barker and then left alone to meet Tina Collins, or he went to Denny's with Barker, took a taxi with Barker to Mr. Jones's house, returned home after the murder, and then dropped off the stolen car at the apartment complex. With respect to the latter scenario, the security guard at the apartment complex testified and positively identified Petitioner, albeit in clothing different from the clothes allegedly provided by Barker, while the taxi driver, as described below, offered information consistent with Barker's testimony. In these circumstances, it was a moot issue whether Barker's clothes fit Petitioner on the night of the murder because there were no additional witnesses who could have observed Petitioner and identified him based on his manner of dress.

### (2)  *Failure to cross-examine witnesses regarding identification*

Petitioner alleges that counsel failed to highlight the fact that employees at the Denny's restaurant, when later interviewed and shown photographic lineups by the police, could tentatively identify Barker but not Petitioner. (Dkt. 26 at 18-19.)

This claim is meritless.  As the PCR court explained, "Since the defendant testified he was at Denny's with Mr. Barker, the failure to call the Denny's employees was not prejudicial."  (ME 3/25/01 at 8.)  Like Barker, Petitioner testified that the pair went to Denny's where Petitioner ordered a soda.  (RT 8/13/92 at 17.)  Given that Petitioner acknowledged being present at the restaurant, the failure of the employees to offer a positive identification was meaningless to his defense.  Petitioner does not explain how counsel's failure to present evidence tending to contradict Petitioner's own testimony constituted deficient or prejudicial performance.

### (3)  *Failure to call taxi driver*

Petitioner alleges that counsel performed ineffectively by failing to call as a witness the taxi driver who, according to Barker's testimony, picked up Petitioner and Barker at Denny's and drove them to the victim's neighborhood.  (Dkt. 26 at 17.)  According to Petitioner, the driver was able to identify Barker but not Petitioner when shown a photo lineup.  (*Id.*)

The PCR court rejected this claim: "The statement of the taxi driver speaks for itself.  The taxi driver corroborated the testimony of Barker.  He also 'kind-of' picked the defendant's photograph in the photo line-up."  (ME 1/24/01 at 8.)

This ruling was not an unreasonable application of *Strickland*.  As the PCR court noted, when interviewed by the police, the taxi driver tentatively identified a photo of Petitioner and corroborated much of Barker's testimony.  (Dkt. 26, Ex. 7.)  He stated that he picked up two men at Denny's on the night of September 4 at around 8:30 or 9:00.  (*Id.*)  One of the men was named Robert.  (*Id.*)  He was shorter than the other man, well-dressed, and carrying a brief case; he sat on the passenger side in the rear of the cab.  (*Id.*)  This information is consistent with Barker's testimony.  (*See* RT 8/4/92 at 123, 126, 129.)  Although he did not know the address, the taxi driver dropped the pair off in front of a house after traveling on Tatum Boulevard and Doubletree Road; they did not go into that house, however.  (Dkt. 26, Ex. 7.)  The man without the brief case paid the fare, about eight dollars.

Again, all of these details are consistent with Barker's testimony. (*See* RT 8/4/92 at 130.)

Based upon this information, the taxi driver's testimony would have been, at best, of equivocal value to the defense case. Therefore, Petitioner cannot show that counsel performed deficiently by failing to call the taxi driver as a witness or that he was prejudiced by counsel's decision.

### *(4) Failure to challenge syringe testimony*

Petitioner alleges that counsel performed ineffectively by failing to challenge Barker's "preposterous" testimony that Petitioner attempted to inject the victim using a large veterinary syringe. (Dkt. 26 at 19.) Specifically, Petitioner attacks counsel for failing to point out that Petitioner, as an intravenous drug user, had access to normal-sized syringes which he could have used on the victim and that with his proficiency at using needles he would not have botched the injection of Mr. Jones. (*Id.*; Dkt. 40 at 19.)

The PCR court rejected this claim:

> Asking about [Petitioner's] proficiency with a syringe would have been more prejudicial than probative. It would have unequivocally established defendant as an I.V. drug user. The defendant would not have been able to state that "if I had been the one trying to stab the victim with a syringe, I could have done it with greater proficiency."

(ME 1/24/01 at 8-9.) This ruling does not constitute an unreasonable application of *Strickland*.

At trial, Barker testified that on the evening of September 4 he observed Petitioner, who was tinkering with Barker's vehicle, "take battery acid out of the battery and put it in a syringe." (RT 8/4/92 at 120.) He further testified that while in Mr. Jones's home he heard Petitioner and Mr. Jones as they discussed injecting Mr. Jones with sleeping medication as an alternative to leaving him tied up, an option which, according to Barker, Mr. Jones accepted. (*Id.* at 34-35, 37.) Petitioner thereafter prepared the syringe and attempted several injections in both of Mr. Jones's arms. (*Id.* at 38-39.) Petitioner had difficulty locating a vein; he asked Mr. Jones to make a fist and pulled down one of his socks in an attempt to find a vein in Mr. Jones's foot. (*Id.* at 38.) Barker testified that Petitioner used a "very big

needle, like the kind that you would use in a veterinarian's office." (*Id.* at 39.) Examination of Mr. Jones's body confirmed puncture marks. (RT 8/6/92 at 67-68, 8/12/92 at 50-55.) Dr. Keen, the medical examiner, testified that one of the puncture wounds was accompanied by a large hemorrhage, caused by "a not too skillful insertion of the needle into the vein" with the needle going into and through the vein.[7] (RT 8/12/92 at 51.) A handkerchief was also found tied around Mr. Jones's upper arm. (RT 8/6/92 at 67.)

Barker's testimony was consistent with a statement he provided during an interview with the police. There, Barker stated that Petitioner used "[a] big hypodermic needle. A real big one." (ROA-PCR 29, Ex. 7 at 20.) He further explained that Petitioner "was running out of the little ones." (*Id.*)

The latter statement contradicts Petitioner's unsupported assertion that he had "numerous human-sized syringes in his house and there is no reasonable explanation why he would have used a veterinary syringe." (Dkt. 26 at 19.) Petitioner offers no evidence that Barker's explanation was inaccurate or that counsel was aware of the availability of smaller needles, let alone that counsel performed in an objectively unreasonable manner by failing to emphasize the issue. In any event, the credibility of Barker's testimony would not have been seriously affected if counsel had pointed out that Petitioner could have used a smaller needle on the victim. As Respondents note, it is not particularly probative to learn that Petitioner did not use one of his own needles to inject a person he was trying to incapacitate or kill.

Petitioner also argues that counsel should have presented evidence, from Petitioner himself and other witnesses, that he was so adept at using a needle to inject himself that he would have been able to inject Mr. Jones quickly and efficiently, in contrast to the unskilled

---

[7]     Dr. Keen's testimony was based on his review of the records prepared by Dr. Heinz Kartnitschnig, who actually performed the autopsy. (RT 8/12/92 at 49.) Dr. Kartnitschnig, Dr. Keen's predecessor as medical examiner, testified via a videotaped deposition; he also identified puncture wound on the victim's arms. (RT 8/5/92 at 135-37; Dr. Kartnitschnig Depo. 5/19/92 at 26-27.)

1   job done by Mr. Jones's assailant.  Again, the value of such information was limited; the
2   jury could readily have concluded that there is a difference in the care and skilled applied
3   when injecting oneself for the purpose of getting high as opposed to injecting another person
4   with the purpose of killing him.

5        Given the limited impeachment value of the information allegedly omitted in defense
6   counsel's handling of the needle issue, and taking into account, as the PCR court did, the
7   opprobrium likely to be associated with intravenous drug use in the jury's mind, counsel's
8   performance in this area was neither deficient nor prejudicial.  The PCR's court's rejection
9   of the claim was not an unreasonable application of *Strickland*.  Therefore, Petitioner is not
10  entitled to relief.

11              *(5)  Failure to use expert to rebut battery acid injection evidence*

12       Petitioner also alleges that counsel performed ineffectively by failing to call an expert
13  to challenge the medical examiner's testimony that it was possible that Mr. Jones had been
14  injected with battery acid.  (Dkt. 26 at 19-20.)

15       The PCR court rejected the claim, explaining that "[t]here was no need for defense
16  counsel to call an expert on the effects of battery acid on the human body.  Dr. Keen
17  provided some information."  (ME 1/24/01 at 9.)  This Court agrees that Petitioner is not
18  entitled to relief.

19       Dr. Keen testified that he could not determine if the injections contained battery acid
20  or another substance such as water.  (RT 8/12/92 at 54.)  He explained that burn marks
21  would be evident if battery acid had contacted the victim's skin, but that he could not
22  ascertain from the photographic records whether the hemorrhaging to the vessel was caused
23  by the solution injected into the vein; to make such a determination, the vena puncture site
24  would have to be excised and analyzed.  (*Id.* at 53-54.)  Because the State's expert testified
25  that there was no evidence that the victim was injected with battery acid, defense counsel
26  had little to gain by presenting expert testimony that battery acid was not used.  In addition,
27  Petitioner offers no evidence that, contrary to Dr. Keen's testimony, an expert could have

28

definitively determined that battery acid was not injected.

Under these circumstances, Petitioner has not shown that counsel performed deficiently by failing to retain his own defense expert or that he was prejudiced by counsel's performance. *See Bower v. Quarterman*, 497 F.3d 459, 471-72 (5th Cir. 2007) (decision not to call an expert witness to rebut the state's ballistics evidence did not constitute deficient performance where counsel felt that the ballistics evidence was weak and brought out those weaknesses in cross-examination of the state's experts); *see also Wildman v. Johnson*, 261 F.3d 832 (9th Cir. 2001) (speculation as to what expert might say "is insufficient to establish prejudice"); *Grisby v. Blodgett,* 130 F.3d 365, 373 (9th Cir. 1997) (same).

Conclusion:

The PCR court did not unreasonably apply *Strickland* in rejecting Petitioner's IAC claims.  Under the deferential standards of the AEDPA, the court's determination that defense counsel's performance was not deficient or prejudicial was objectively reasonable. Therefore, Petitioner is not entitled to relief on Claim D.

**Claim E:  Confrontation Clause Violation**

Petitioner contends that his due process and confrontation rights were violated by the trial court's refusal to allow cross-examination concerning Barker's alleged satanic beliefs. (Dkt. 26 at 20-22.)

Background:

During cross-examination, defense counsel asked Barker what number he dialed when he pretended to use the telephone in the victim Jones's house.  Barker answered that he "dialed straight sixes."  (RT 8/5/92 at 112.)  The examination continued:

Q:  Why did you dial those numbers?

A:  Because of – I used to have an old belief in the occult.

Q:  When did you do away that belief?

Prosecutor:  Relevance, Your Honor.

The Court:  Sustained.

1    Mr. Hazel [for Defendant]:  Pardon me, Your Honor, I didn't –

2    The Court:  Sustained.

3    Mr. Hazel:  Your Honor, can we approach on that point?

4    The Court:  Later.

5    Mr. Hazel:  But, in fact, you had an alter [sic] in your – a Satanic alter [sic] in your
     room; is that correct?

6

7    Prosecutor:  Same objection.

8    The Court:  Sustained.

9    (*Id.* at 112-13.)

10       The judge sustained the State's objection on relevance grounds, basing her ruling on

11   Arizona Rule of Evidence 610 and Article 2, § 12, of the Arizona Constitution, which bar

12   questioning a witness about religious beliefs as a means of enhancing or attacking the

13   witness's credibility.[8]  *Towery*, 186 Ariz. at 178, 920 P.2d at 300.  Subsequently, in a

14   discussion outside the presence of the jury, the judge asked defense counsel why the ruling

15   should be reversed. Counsel explained that he had seen what looked like a satanic altar in

16   a photograph of Barker's bedroom and wanted to ask Barker to confirm its identity. He

17   continued, "I think it's important that the jury know that he has some different type of

18   beliefs that other people may not."  (RT 8/5/92 at 140-41.)  The trial judge asked for case

19   law showing that satanism was an exception to the rule prohibiting a party from introducing

20   evidence of a witness's religious beliefs.  (*Id.*)  Counsel agreed to find such authority but

21   never offered any.  *Towery*, 186 Ariz. at 178, 920 P.2d at 300.

22       On appeal, Petitioned claimed that testimony about Barker's satanic beliefs was not

23   offered to impeach his credibility but to show that the nature of his beliefs disposed him to

24          [8]       Pursuant to Rule 610, "Evidence of the beliefs or opinions of a witness on

25   matters of religion is not admissible for the purpose of showing that by reason of their nature
     his credibility is impaired or enhanced."  Article 2, § 12, of the Arizona Constitution states:

26   "No . . . person [shall] be incompetent as a witness or juror in consequence of his opinion on
     matters of religion, nor be questioned touching his religious belief in any court of justice to

27   affect the weight of his testimony."

28

engage in criminal conduct and to commit the murder.  The Arizona Supreme Court denied the claim:

> A witness' religious beliefs are admissible if offered for some legitimate purpose other than attacking witness credibility.  Defendant argues that the evidence was relevant to an issue other than Barker's veracity.  Had he been allowed to develop testimony about Barker's satanic beliefs, the jury might have been persuaded to believe that Barker, not Defendant, was the killer.   In addition, although the jury nevertheless could have found Defendant's involvement sufficient to convict him for felony murder, his death eligibility was not a foregone conclusion.  Although the judge found beyond a reasonable doubt that Defendant was the killer, evidence that Barker was profoundly touched by some satanic belief might have altered that finding.
>
> Defendant, however, made no offer of proof of what Barker's testimony would have shown.  Nor does the context of the question indicate the nature of Barker's satanic belief or show it was substantively relevant.  When an objection to the introduction of evidence has been sustained, an offer of proof showing the evidence's relevance and admissibility is ordinarily required to assert error on appeal.  Given that counsel normally does not know in advance what a hostile witness will say on cross-examination, the offer-of-proof requirement for considering a claim on appeal may be relaxed when the court sustains an objection to a question asked on cross-examination.  Even so, something more than speculation about possible answers is required to show prejudice.  At a minimum, an offer of proof stating with reasonable specificity what the evidence would have shown is required.  In Arizona, it has been suggested that counsel be required to discover evidence that would make the proffered testimony relevant and make it known to the court.
>
> We recognize, however, that discovery in criminal cases is much more limited than in civil cases. . . .  Nonetheless, when the context of the examination fails to reveal the nature of the expected answer, the proponent of the precluded evidence must seek permission from the trial judge to make the offer of proof so that the reviewing court can determine whether the trial judge erred in precluding the evidence.  It is remotely conceivable that Barker might have revealed he was driven by a satanic force or some other evil belief to commit criminal acts.  The only hint of a satanic motive for Barker's participation in the crime, however, was his dialing sixes on the telephone.  That alone has little probative value in establishing a motive to kill.  Assuming Barker had a satanic altar in his room, Defendant failed to discover how often Barker used it and how its use was related to his criminal conduct.  In fact, Barker's claim that he used to believe in the occult indicates that the alleged altar no longer had any religious significance to him.  Defendant's failure to establish the connection between Barker's old belief in the occult and the crime by an offer of proof in the record makes it impossible to evaluate whether the trial judge unfairly limited Defendant's cross-examination of Barker.  On this record, we see no probative value in the precluded evidence apart from its effect on Barker's credibility.  Thus we find no error in the judge's precluding it.

*Towery*, 186 Ariz. at 178-79, 920 P.2d at 300-01 (citations omitted).

<u>Analysis:</u>

Petitioner asserts that satanism is not a religion and therefore the trial court improperly relied on Rule 610 to limit the cross-examination. (Dkt. 26 at 21.) He also contends that evidence of Barker's supposed satanic beliefs "should have been admissible to show his bias, motivation, and motive in committing this murder." (Dkt. 40 at 22.) According to Petitioner, because "[i]t is well known that satanic rituals involve the use of human blood," the jury, if it had been allowed to hear evidence of Barker's satanic beliefs, could have inferred that he, rather than Petitioner, used the syringe on the victim, in order to extract his blood. (*Id.*) The Court concludes that none of these arguments support Petitioner's claim for habeas relief.

First, state law matters, including a trial court's evidentiary rulings, are generally not proper grounds for habeas corpus relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (internal quotation omitted); *see Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). Therefore, an erroneous application of Rule 610 does not form a basis for habeas relief.

The right to confront witnesses, guaranteed by the Sixth and Fourteenth Amendments, includes the right to cross-examine adverse witnesses to attack their general credibility or show possible bias or self-interest. *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (per curiam); *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986); *Davis v. Alaska*, 415 U.S. 308, 316 (1973). However, "[t]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish," *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985), and "judges retain wide latitude insofar as the Confrontation Clause is concerned" and may impose limitations on cross-examination that are "reasonable" and are

not "arbitrary or disproportionate to the purposes they are designed to serve." *Van Arsdall*, 475 U.S. at 679.

A Confrontation Clause violation occurs where the defendant is prevented from investigating "a prototypical form of bias" and "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680; *see United States v. Jenkins*, 884 F.2d 433, 436 (9th Cir. 1989) (explaining that a Sixth Amendment violation will normally be found only if the jury was "denied sufficient information to appraise the biases and motivations of the witness."). Because improper denial of the opportunity to impeach a witness for bias is subject to a harmless-error analysis, *Van Arsdall*, 475 U.S. at 684, a petitioner is not entitled to relief unless he can establish that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Forn v. Hornung*, 343 F.3d 990, 999 (9th Cir. 2003) (Confrontation Clause error did not have a "substantial and injurious" effect on the verdict and the error was therefore harmless).

To determine if the error was harmless, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. This assessment "depends upon a host of factors . . . includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* The Ninth Circuit, relying on *Van Arsdall* and *Fensterer*, utilizes a three-part test to determine whether a trial court violated the Confrontation Clause, considering: "(1) whether the excluded evidence was relevant; (2) whether there were other legitimate interests outweighing the

defendant's interest in presenting the evidence; and (3) whether the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." *United States v. Larson*, 460 F.3d 1200, 1207 (9th Cir. 2006).

In *Van Arsdall*, the trial court barred any cross-examination concerning a plea deal by which criminal charges against the witness were dropped in exchange for his promise to speak with the prosecutor about the murder charge against the defendant. 475 U.S. 676. The Supreme Court held that the defendant's Confrontation Clause rights were violated because the attempted cross-examination could have exposed facts from which the jury "could appropriately draw inferences relating to the reliability of the witness." *Id.* at 680. In *Olden*, the Supreme Court held that a Confrontation Clause violation occurred when the trial court excluded "otherwise appropriate" cross-examination regarding evidence that the complainant in a sexual misconduct trial was living with the prosecution's key witness at the time of trial. 488 U.S. at 231. The Court noted that the defendant's desire to demonstrate that the complainant had a motive to lie in order to protect her current relationship was an attempt to demonstrate a "prototypical form of bias." *Id.*

Any error in limiting the cross-examination of Barker did not rise to this level. Defense counsel's attempt to elicit testimony about Barker's religious beliefs did not constitute an otherwise appropriate effort to impeach Barker's credibility or explore a prototypical form of bias such as a plea agreement, a reduced sentence, or other "ulterior motives of the witness." *Davis*, 415 U.S. at 316. Instead, the questions implicated subject matter – the witness's religious beliefs – placed off limits by the rules of evidence and possessing no specific impeachment value or other relevance. Thus, there were other legitimate interests outweighing Petitioner's interest in presenting evidence of Barker's occult beliefs. *See Larson*, 460 F.3d at 1207.

In addition, as the Arizona Supreme Court noted, the testimony sought by Petitioner was of only speculative relevance to the identity of Mr. Jones's assailant. Petitioner was not able to make an offer of proof in support of his questions regarding Barker's religious

beliefs and their relevance to his testimony.  "It is well established that purely conjectural or speculative cross-examination is neither reasonable nor appropriate." *Searcy v. Jaimet*, 332 F.3d 1081, 1088 (7th Cir. 2003); *see DiBenedetto v. Hall*, 272 F.3d 1, 10-11 (1st Cir. 2001) (court may circumscribe cross-examination if the party is unable to lay a proper evidentiary framework; where the offer is inherently speculative, the trial judge may prohibit cross-examiners from mounting fishing expeditions); *Bui v. DiPaolo*, 170 F.3d 232, 243-46 (1st Cir. 1999) ("One well-established basis for circumscribing cross-examination is a party's inability to lay a proper evidentiary foundation for the questions he wishes to pose"); *Jones v. Berry*, 880 F.2d 670, 674-75 (2d Cir. 1989) (where the record suggests no facts or information which continued questioning would have exposed and counsel failed to make an offer of proof or indicate the proper basis for the question, the court could not conclude there was a Confrontation Clause violation).  As the Second Circuit noted in *Jones*:

> the present case stands in sharp contrast to those cases in which the trial record made clear what facts the defendant had sought to elicit on cross-examination. . . .  In the absence of any representation as to what facts might have been brought out had cross-examination not been curtailed, we are hard-pressed to conclude that the unpermitted questions had damaging potential.

*Jones*, 880 F.2d at 674 (citing *Davis*, 415 U.S. at 310-11; *Van Arsdall*, 475 U.S. at 679).

Here, Petitioner was unable to provide an offer of proof regarding a satanic motivation for Barker to have killed Mr. Jones, beyond counsel's assertion that the jurors were entitled to know that Barker's religious beliefs were different than theirs.  In the absence of any indication of what Barker's testimony might have been, the Court cannot find that the proposed cross-examination possessed any damaging potential.  Under these circumstances, the excluded evidence was of limited relevance, if any.  *Larson*, 460 F.3d at 1207.

Finally, courts are less inclined to find Confrontation Clause violations when the defendant has been afforded substantial cross-examination.  *See Bright v. Shimoda*, 819 F.2d 227, 229 (9th Cir. 1987) (federal habeas court will rarely find a constitutional violation if

the defendant was allowed to cross examine a witness at length and was restricted solely on a collateral matter).   In contrast to *Van Arsdall* and *Olden*, in Petitioner's case defense counsel was able to cross-examine Barker thoroughly, focusing on a prototypical form of bias – Barker's lenient plea agreement – as his motivation for implicating Petitioner.   The Court concludes that notwithstanding the evidence omitted as a result of the trial court's ruling, the jury was left with sufficient information to assess Barker's credibility. *Larson*, 460 F.3d at 1207.

Although Barker was the State's key witness, in light of the factors discussed above, Petitioner has not shown that the trial court's exclusion of testimony regarding Barker's religious beliefs had a substantial, injurious impact on the jury's verdict. *Brecht*, 507 U.S. at 637.

The Arizona Supreme Court's resolution of this claim was neither contrary to nor an unreasonable application of clearly established federal law.   Therefore, Petitioner is not entitled to relief on this claim.

### Claim F: *Ring* Violation

Petitioner alleges that his rights under the Sixth Amendment were violated because a judge, rather than a jury, determined his sentence.  (Dkt. 26 at 22-23.)  In *Ring v. Arizona*, 536 U.S. at 609, the United States Supreme Court held that Arizona's aggravating factors are an element of the offense of capital murder and therefore must be found by a jury. However, relief on this claim is foreclosed by the Court's subsequent decision in *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), which announced that *Ring* does not apply retroactively to cases already final on direct review.   Because direct review of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief on Claim F.

### Claim G:  Arizona's Death Penalty Fails to Channel Sentencer's Discretion

Petitioner alleges that the Arizona's death penalty statute violates the Eighth Amendment because it provides the sentencer with "little or no discretion on how to weigh and compare the mitigating factors with the aggravating factors." (Dkt. 26 at 23.)  The

Arizona Supreme Court denied the claim on direct appeal. *Towery*, 186 Ariz. at 189-90, 920 P.2d at 311-12.

The claim is without merit. Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Lewis v. Jeffers*, 497 U.S. 764, 774-77 (1990); *Walton v. Arizona*, 497 U.S. 639, 649-56 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002); *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998); *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996). Petitioner is not entitled to relief.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of the merits of

Claim A, alleging prosecutorial misconduct, and will grant a COA as to that issue. For the reasons stated in this Order, the Court declines to issue a COA with respect to any other claims.

## CONCLUSION

For the reasons set forth above, Petitioner is not entitled to habeas relief.  Petitioner did not request evidentiary development, and the Court finds that evidentiary development is not warranted.  *See* Rule 8, Rules Governing Section 2254 Cases.

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 26) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** vacating the stay of execution issued by this Court on May 5, 2003.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issue:  Whether the Court erred in determining that Claim A, alleging prosecutorial misconduct, lacked merit.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 30th day of September, 2008.

_____
Mary H. Murguia
United States District Judge